js-6

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Michael T. Mason | Sitting Judge If Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 8462 | **DATE** | 5/5/2004 |
| **CASE TITLE** | | Burnett vs. Barnhart | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1)  ☐  Filed motion of [ use listing in "Motion" box above.]

(2)  ☐  Brief in support of motion due _____.

(3)  ☐  Answer brief to motion due_____.  Reply to answer brief due_____.

(4)  ☐  Ruling/Hearing on _____ set for _____ at _____.

(5)  ☐  Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6)  ☐  Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7)  ☐  Trial[set for/re-set for] on _____ at _____.

(8)  ☐  [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9)  ☐  This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
         ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10)  ■  [Other docket entry]  As stated in the attached Memorandum Opinion and Order, plaintiff's motion for summary judgment [17-1] is granted and defendant's motion for summary judgment [19-1] is denied. This case is remanded to the Commissioner pursuant to sentence four of 42 U.S.C. sect. 405(g) for further proceedings consistent with this Opinion. This is a final judgment and order.

(11)  ■  [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | **2** | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | MAY 0 6 2004 | |
| | Notified counsel by telephone. | | date docketed | 22 |
| | Docketing to mail notices. | | GMA | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 5/5/2004 | |
| KF | courtroom deputy's initials | U.S. DISTRICT COURT CLERK  2004 MAY -5 PH 12: 47 | date mailed notice  KF | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

FILED

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RICHARD BURNETT,                        )
                                        )
                Plaintiff,              )
                                        )   No. 02 C 8462
        v.                              )
                                        )   Mag. Judge Michael T. Mason
JO ANNE B. BARNHART                     )
Commissioner of Social Security,        )
                                        )
                Defendant.              )

MEMORANDUM OPINION AND ORDER

**DOCKETED**

MAY 0 6 2004

Michael T. Mason, United States Magistrate Judge:

Plaintiff, Richard Burnett ("Burnett" or "plaintiff"), has brought a motion for summary judgment seeking judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner" or "defendant"), who denied Burnett's claim for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act ("Act"), 42 U.S.C. §§ 416(i), 423(d), 1381a. Defendant, Barnhart, filed a cross motion for summary judgment asking that we uphold the decision of the Administrative Law Judge ("ALJ"). We have jurisdiction to hear this matter pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the following reasons, we grant plaintiff's motion and deny defendant's motion, remanding this case to the ALJ for further proceedings consistent with this opinion.

**Procedural History**

Burnett filed an application for DIB and SSI on August 20, 1999, alleging disability since July 4, 1999, without regard to his substance abuse. (R. 146-9). Prior to this application, plaintiff had been awarded benefits based on his dependence on

drugs. (R. 45). However, his benefit eligibility ceased in January, 1997 after the enactment of Public Law 104-121, the "Contract With America Advancement Act of 1996." On March 1, 2001, ALJ Helen G. Copper conducted a hearing on plaintiff's current petition. Mr. Burnett, Dr. Ellis Johnson, a psychiatrist, and Mr. Edward Steffan, a vocational expert, testified at the hearing. (R. 37). Afterwards, plaintiff supplemented the ALJ's record with additional medical evidence. (R. 142) The ALJ closed the record and issued an opinion denying plaintiff's claim. The Appeals Council denied plaintiff's request for review and ALJ Copper's decision became the final decision of the Commissioner. *See Zurawski v. Halter*, 245 F.3d 881 (7th Cir. 2001); Reg. § 416.1481.

### Plaintiff's Testimony

Richard Burnett, now fifty-four years old, is an Air Force veteran with a twelfth-grade education. (R. 47-8). Burnett was honorably discharged from the Air Force under special conditions and his past work experience includes employment as a security guard, food assembler, and telephone installer/repairman. (R. 48, 95).

At the hearing, plaintiff testified that, physically, his main problem was his back, and pain in his elbow and knee joints. (R. 50). He also stated that lately he had been having bad cramps in his legs and that he experienced daily pain in various locations. (R. 50, 71). He further stated that his condition had progressively worsened. If he worked one day, the next day, his body was too sore to go to work. (R. 50). He also stated that his body was just too tired after a day's work and that he had difficultly finishing tasks assigned at work. (R. 50-1). At the time of the hearing, plaintiff was on a daily regimen of extra strength Tylenol for pain, blood pressure medication, and

2

Mirtazapine for depression. (R. 68-9, 73). Plaintiff also used an inhaler for breathing problems. (R. 69).

Burnett testified that he had trouble remembering doctor's appointments and remembering to take his medication. (R. 52). At times, he felt like someone was watching him and trying to harm him. He also felt guilty about his way of life and not being there for his son. (R. 52-3). He watched TV for enjoyment, but sometimes had problems following the programs. *Id.* He testified that he had trouble sleeping and had been prescribed medication to help him sleep. (R. 54). He also stated that sometimes he had thoughts of suicide and thought about harming his girlfriend, but he never acted on those thoughts. (R. 55).

At the time of the hearing, plaintiff had also been in a Methadone program for drug dependency for the prior two years. (R. 73-4). He stated that he did not miss more than a day of his Methadone treatments because if he did, he became depressed, sick, and weaker. *Id.* He also testified that he still occasionally used drugs and had used them the previous night. *Id.* His biggest problem was cocaine and marijuana. He obtained drugs by making purchases for others who gave him some as payment. (R. 75). Plaintiff had positive urine drops throughout 2000, and he testified that the longest time he had gone without using was "[a] few weeks maybe." (R. 76).

Plaintiff supported himself with food stamps, occasional work through Earnfair, a government job program, and financial help from his aunt and uncle. (R. 57). His most recent Earnfair job lasted about a month and involved cleaning and letting cars in and out at a car glass replacement shop. *Id.* Prior to that, plaintiff worked unloading trucks for a retailer for approximately four months. *Id.* Plaintiff did not have any other sources

3

of income. (R. 60). At home, plaintiff did chores around his apartment, including sweeping and making his bed, however, it hurt to sweep. (R. 77).

At the hearing, plaintiff stated that he did not think he could currently work. (R. 66). Plaintiff thought that he could comfortably lift ten to twenty pounds, and could comfortably stand in place for about twenty to thirty minutes before his back would start to hurt. (R. 78). Plaintiff also stated that he could walk a block before having to rest. (R. 78-9). He stated that he had trouble using his hands because his fingers became cold very easily and he had less feeling in them than in the rest of his body. (R. 79).

After Burnett, Dr. Ellis Johnson testified as a medical expert and Edward Steffen testified as a vocational expert. Mr. Burnett's representative stipulated that both witnesses were competent to testify as experts in their respective fields. (R. 80). Before the ALJ asked the witnesses for their opinions, she allowed them to question the plaintiff. (R. 81). Thereafter, Dr. Johnson testified that, in his opinion, Burnett suffers from the mental impairment of depression, but that it does not meet or equal a listed impairment. (R. 89). As a basis for his opinion, Dr. Johnson stated that Dr. Piszczor "listed about five different - eight different characterizations of depression under affective order."[1] (R. 90). Then, Dr. Johnson testified that Dr. Piszczor found that "under the degree of limitations of those problems, . . . [plaintiff's] restrictions of activities of daily living was slight, [and] difficulties in maintaining social functioning was

_____

[1] Specifically, Dr. Piszczor found that plaintiff suffered from the following affective disorders; anhedonia, weight loss, sleep loss, psychomotor retardation, decreased energy, feelings of guilt, feelings of worthlessness, acting without regard to likely painful consequences, infrequent suicidal thoughts, and difficulty concentrating or thinking. (R. 250).

4

slight."[2] Dr. Johnson further testified that "on the basis of that report, and that is the only report that I saw, he caused me to feel that he does not meet or equal a listed ---." Id.

Thereafter, the ALJ informed Dr. Johnson that she thought he was looking at Dr. Tomassetti's report and not Dr. Piszczor's report because Dr. Piszczor did not complete a PRTF. Dr. Johnson then stated that he was in fact looking at Dr. Tomassetti's PRTF, not Dr. Piszczor's report, and that he agreed with Dr. Tomassetti. Dr. Johnson further opined that plaintiff's functional capacity would improve if he were 100% sober for an extended period of time. He based that opinion on the statements that plaintiff used drugs and is in a Methadone program. (R. 91). He opined that "[i]f [plaintiff] were not using at all, I think that he would be able to function better, and be able to work at a more acceptable pace than he has been." The ALJ did not ask Dr. Johnson any questions about Dr. Piszczor's March, 2000 evaluation of plaintiff. However, Burnett's representative asked Dr. Johnson whether he disagreed with Dr. Piszczor's report. Dr. Johnson responded that he did "not disagree with Dr. Pizszcor's report. If fact [he] was reading from his report ---." That was the end of Dr. Johnson's testimony.

Finally, Edward Steffen, a vocational expert, testified. He stated that plaintiff's past relevant jobs included security guard, food assembler and telephone installer/repairman. (R. 95). The security guard position was considered light, unskilled employment, and the food assembler and phone installer/repairman positions were considered medium employment. Id.

---

[2] As discussed below, Dr. Piszczor never made such a finding. In fact, Dr. Piszczor made an opposite finding.

Mr. Steffan responded to the ALJ's hypothetical about possible employment for a person with the residual functional capacity ("RFC"), "to perform the full range of work at the light exertional level, with the following exceptions or limitations; that he should never climb ladders, ropes or scaffolds, that he can occasionally climb ramps and stairs, occasionally balance, stoop, kneel crouch and crawl, that he should avoid exposure to extreme coldness, to concentrated respiratory irritants, to unprotected heights, or unguarded hazardous equipment, and that he is moderately limited in his ability to understand, remember and carry out complex or detailed instructions or tasks," by stating that such a person could perform work as a food assembler and security guard. (R. 96).

The ALJ also asked Mr. Steffan if it would affect his opinion if the hypothetical person was moderately limited in his ability to sustain concentration. *Id.* Mr. Steffan opined that it would not affect the food assembler position, but could affect the security guard position because being a security guard requires a higher degree of attention and concentration. *Id.* The ALJ then asked Mr. Steffan to identify other occupations, with sufficient positions in this economy, that the hypothetical person could perform. *Id.* Mr. Steffan responded with assembler, cashier and general office clerk. *Id.* Mr. Steffan was also asked to identify positions for the hypothetical person if he was limited to sedentary work. *Id.* Mr. Steffan stated sedentary assembler, file clerk, and general office clerk. (R. 98).

Finally, Mr. Steffan said that if the hypothetical person was distracted by feelings of pain, fatigue, depression or any other kind of distraction for less than five percent of the work day - outside of ordinary breaks - he could still perform the previously cited

jobs. *Id.* Mr. Steffan also stated that people in these types of jobs are generally off-task about 20 percent of the day and that is considered to be within adequate production levels. However, being off-off task more than twenty percent of the day would interfere with a person's ability to perform those jobs. (R. 99).

## Medical Examinations

## Mental Problems

In addition to the testimony of the three witnesses, the ALJ considered plaintiff's extensive medical record. Plaintiff received treatment at the VA West Side Facility ("VAWS") on October 24, 1996 for drug dependence. (R. 200-1). At the time, he reported a long history of dependence on alcohol, cocaine, heroin, and marijuana. *Id.* He was cleared for the Methadone maintenance program and began receiving Methadone. (R. 203). However, he was discharged from the program for noncompliance and nonattendance on February 26, 1997. (R. 216). Plaintiff was readmitted in February,1998, but again had poor compliance with the treatment. (R. 531).

On May 25, 1999, a case technician at VAWS referred Burnett to Dr. Joseph Piszczor, a psychiatrist. *Id.* Dr. Piszczor treated Burnett once or twice a month from July, 1999 through the time of the ALJ's hearing.[3] (R. 547). During their entire treatment relationship, plaintiff reported rather consistent drug usage. At their first visit, plaintiff reported that he had been depressed the prior six months "over his drug usage, his living situation, his financial situation and his relationship with his significant other."

---

[3] We will not reference every appointment between Burnett and Dr. Piszczor. We will only include appointments with information significant to this opinion.

7

*Id.* He also stated that was not sleeping or eating well and could not concentrate. *Id.* He had frequent crying spells and occasional feelings of helplessness and hopelessness. *Id.* He also admitted to frequent drinking and frequent use of small quantities of cocaine, heroin, and marijuana. *Id.* Dr. Piszczor diagnosed major depression; opiate, cocaine, and cannabis dependence; and opiate withdrawal. (R. 549). He prescribed a low dose of an anti-depressant and increased Burnett's Methadone dosage. *Id.*

At their August visit, Dr. Piszczor prescribed an additional anti-depressant, Trazedone, and increased plaintiff's anti-depressant dosage. (R. 553). The Trazedone was discontinued a week later due to side effects. *Id.* At a November visit, Dr. Piszczor's found that plaintiff's depression was generally improved and would improve more when his homelessness problem was resolved. (R. 305). In the end of November, plaintiff returned, complaining of poor sleep, poor concentration, and frequent crying spells due to his depression. (R. 307). He also occasionally considered hurting himself or his girlfriend, but was able to refrain from doing so. *Id.*

In a January 21, 2000 progress note, Dr. Piszczor wrote that he had advised plaintiff "again that he needs to stop illicit drug usage completely, particularly since this probably contributes to his depression." (R. 315). On March 6, 2000, plaintiff reported that he had not taken his anti-depressant medicine for about one week and that his mood had been "poor" and "sluggish." (R. 295). He experienced poor sleep, poor concentration and thoughts of suicide four days earlier. *Id.* Dr. Piszczor found him "mildly depressed" and noted that his depression was "worse off his medication." *Id.*

8

He re-prescribed anti-depressant medication and increased plaintiff's Methadone dose because Burnett complained of cravings for heroin. *Id.*

At the March 13 visit, plaintiff asked Dr. Piszczor to fill our a Psychological/ Psychiatric Impairment Report, which he did. (R. 248). Dr. Piszczor found that plaintiff suffered from depression with the following symptoms; anhedonia, weight loss, sleep loss, psychomotor retardation, decreased energy, feelings of guilt, feelings of worthlessness, acting without regard to likely painful consequences, infrequent suicidal thoughts and difficulty concentrating or thinking. (R. 250). Dr. Piszczor found that these symptoms were triggered or caused by encounters with people, being at home with family, and that they were worsened by his occasional cocaine use. (R. 252). Dr. Piszczor found that plaintiff's depression restricted his daily activities and that he "isolates" when depressed. *Id.* He also found that plaintiff's illness caused repeated episodes of deterioration or decompensation in work or worklike situations, specifically problems with concentration. (R. 253). Dr. Piszczor further opined that Burnett would not be able to work in a non-sheltered work setting. *Id.* Specifically, he stated that "problems with concentration, his tendency to isolate and problems dealing with people would prevent [non-sheltered work] at present." *Id.*

On May 15, 2000, Dr. Piszczor found that plaintiff's depression was still significant. *Id.* In July, Dr. Piszczor found that Burnett's depression was "well-controlled." (R. 405). In August, Dr. Piszczor found that plaintiff's depression was worse because he was worried about possibly having a serious medical illness. (R. 403). In October, Dr. Piszczor found that plaintiff's depression was well controlled since

starting Mirtazapine. (R. 389). At a March 7, 2001 appointment, Dr. Piszczor recommended an increase in Burnett's anti-depressant dosage. (R. 633).

In October, 1999, plaintiff also underwent a psychiatric consultative exam performed by Dr. David Gehlhoff. (R. 230). Dr. Gehlhoff found plaintiff to be a "very depressed appearing man." *Id.* Plaintiff told him his drug habit was $10.00 to $20.00 a day three or four months ago and is now about $5.00 twice a week. *Id.* Plaintiff also stated that he had been depressed for the past six months, but not suicidal. *Id.* He stated that he was depressed generally and because he had lost his place to live and possessions. *Id.* His mental status exam showed a depressed mood and limited recent memory. (R. 231-2). Plaintiff had difficulty with serial seven subtraction. *Id.* Dr. Gehlhoff diagnosed a substance abuse history, though minimal at the present time, and adjustment reaction with a very significant depressed mood. (R. 232).

**Physical Problems**

Plaintiff was admitted to VAWS in December,1998 for peptic ulcer disease. (R. 219). In September,1999, Burnett was admitted for observation and discharged with a diagnosis of gastritis. (R. 229). Plaintiff underwent a colonoscopy and endoscopy, which were negative. (R. 270). In October, Dr. Ghanim Kassir examined plaintiff on behest of the Commissioner. (R. 234). Dr. Kassir noted plaintiff's musculoskeletal and neurological exams as normal. (R. 236). He diagnosed musculoskeletal lower pain, gastroescophageal reflux disease, previous history of peptic ulcer, arthralgia in both elbow joints, and illicit substance abuse including heroin and cocaine for the past twenty years. *Id.*

Then in February, 2000, plaintiff injured himself at work and sought treatment at

10

VAWS. Plaintiff complained of foot, back, neck, elbow, and knee pain, but his primary complaint was lower back pain from the injury. (R. 263). Plaintiff reported that he was injured at work when the chair he was sitting in collapsed. *Id.* He returned to the clinic the next day and requested that they fill out worker's compensation forms. (R. 261). The results of plaintiff's physical exams were generally normal. (R. 261-3).

In March, plaintiff reported unusual sensations affecting both his hands when they were exposed to cold temperatures. (R. 319-21). The examiner found decreased sensation to pinpricks in both arms and fingertips, but plaintiff's hand strength was normal. (R. 321). The examiner prescribed a low dose of hypertension medication for plaintiff's elevated blood pressure. *Id.*

On March 14, 2000, plaintiff had a lumbar x-ray. (R. 287). The x-ray showed some degenerative joint disease and suggested possible metastatic neoplasm (cancer) at the L4 to L5 level. *Id.* Plaintiff also had a chest x-ray, which showed chronic obstructive pulmonary disease ("COPD"). *Id.* An April electrodiagnostic exam of plaintiff's elbow showed a "focal injury" to the left ulnar nerve. (R. 456).

On May 15, a doctor evaluated plaintiff's chart and recent test results, and found that plaintiff's abnormal lumber x-ray was unlikely to be metastatic cancer. (R. 460). The doctor also noted a positive urine test for heroin and cocaine. *Id.* In August, follow-up chest and lumbar x-rays showed that plaintiff's condition was stable. (R. 401). The doctor noted increased sclerosis in L4 to L5, which was likely a degenerative change, and ordered a bone scan for evaluation. *Id.* Plaintiff's bone scan suggested likely degenerative changes. (R. 421). Plaintiff was advised to have a repeat scan in three to six months. *Id.*

11

In November, plaintiff had a lumbar MRI, which showed "mild disc bulge ...at L5-S1" and atrophy of the psoas muscle. (R. 520). In December, Plaintiff sought treatment for pain, but the attending physician refused to prescribe narcotic strength pain medication due to plaintiff's history of drug use. (R. 617-19). A straight leg raising exam ("SLR") was negative and Dr. Duvel noted that plaintiff November, 2000 MRI showed degenerative disc disease at L4 to L5 and at L5 to S1, with a mild bulge and no significant stenosis. (R. 619). The doctor advised plaintiff to continue taking other pain medication and made a physical therapy evaluation referral. *Id.*

In January, 2001, plaintiff still complained of low back pain and an abnormal sensation in his right neck and shoulder that traveled down his right arm. (R. 621). Dr. Matthews examined him, finding that his cervical spine was tender and his reflexes were equal bilaterally. *Id.* Dr. Matthews noted that plaintiff's symptoms were "described in a dermatomal fashion across the right rotator cuff muscle group." *Id.* A straight leg raising exam ("SLR") was reported positive at 75 degrees. *Id.* Dr. Matthews found that plaintiff's neck pain was likely cervical in origin and he ordered an x-ray and cervical MRI. *Id.* This was the first time a cervical MRI had been performed. Dr. Matthews also refused to prescribe Tylenol #3 despite plaintiff's request and instead prescribed Neurontin. *Id.*

On January 24, plaintiff sought treatment for a persistent cold. (R. 623). Dr. Medina prescribed antibiotics and advised plaintiff to stop smoking. *Id.* Plaintiff returned a few days later with continued cold symptoms. (R. 625). The doctor found that plaintiff's upper respiratory infection was improving slowly. (R. 627).

In February, plaintiff's cervical MRI showed degenerative disc disease, worse at

12

C4 to C5, where there was a large central osteophyte and associated disc herniation. *Id.* The report also indicated "moderate central stenosis" and ischemic (decreased blood flow) changes in the middle part of the brain stem. *Id.* After reviewing the cervical MRI, Dr. Matthews found degenerative disc disease, worse at C4 to C5 and C5 to C6, and moderate central stenosis. (R. 629). He also found central disc herniation and a bone spur at C4 to C5, some narrowing of the foramen (passage for the nerve) at C4 to C5, and a disc bulge at C5 to C6 and C6 to C7. (R. 631). Dr. Matthew diagnosed bilateral cervical radiculopathy with other degenerative changes in the bone and discs, and advised plaintiff to continue to take Neurontin and prescribed Tylenol #3. *Id.* He also noted the need for a neurosurgical evaluation and made a physical therapy referral. *Id.* He prescribed Salsalate for arthritic pain control and recommended Aspercreme for neck pain. *Id.* Dr. Matthews found that plaintiff was unable to perform even sedentary work due to his cervical disease and that "a major cause of the patient's substance abuse is due to chronic debilitating pain from the patient's neck." (R. 475-478). Dr. Matthews also noted that plaintiff "may require neurosurgery for his neck arthritis, spinal cord compression, [and] nerve impairment." (R. 476).

Based on the testimony at the March 1, 2001 hearing and the medical evidence in the record, the ALJ issued her decision on April 27, 2001. The ALJ found that plaintiff's disability did not meet or equal any listed impairments and that he had the physical RFC to perform and sustain a wide range of light work. She also found that plaintiff lacked the mental RFC to sustain even simple, unskilled work, but would be able to sustain such work if he were able to achieve and maintain full sobriety. Additionally, the ALJ concluded that there would be a significant number of jobs in the

13

national economy that plaintiff could perform if he achieved and maintained sobriety, including assembler, cashier, and general office clerk. On that basis, the ALJ found plaintiff not disabled and denied his request for benefits.

## Standard of Review

We must affirm the ALJ's decision if it is supported by substantial evidence and free from legal error. 42 U.S.C. §405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is more than a scintilla of evidence and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The ALJ need not weigh every piece of evidence, however, when the Commissioner's "decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele*, 290 F.3d at 940. Generally, we cannot substitute our judgment for that of the ALJ by deciding facts anew, reweighing the evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998).

## Analysis

A person is disabled under the Act if he or she has an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). In determining whether a claimant is disabled, the ALJ conducts a five step analysis: (1) whether the claimant is presently unemployed, (2) whether the claimant's impairment is severe, (3) whether the impairment meets or exceeds any of

the specific impairments listed in the regulation, (4) whether the claimant is unable to perform his or her previous occupation and (5) whether the claimant is unable to perform any other work in the national economy given his or her age, education, or work experience. *Cichon v. Barnhart*, 222 F. Supp. 2d 1019, 1025 (N.D. Ill. 2002) (citing 20 C.F.R. § 416.920(a) - (f)). Affirmative answers at steps three and five will lead to a finding that the claimant is disabled. *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). A negative answer at any step, other than three, will result in a finding that the claimant is not disabled. *Id.* The claimant carries the burden of proof for steps one through four. *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). If the analysis reaches step five, the burden shifts to the Commissioner to show that there are other jobs in the economy that plaintiff is capable of performing. *Id.*

Additionally, the ALJ must "build an accurate and logical bridge from the evidence to [her] conclusions so that [the Court] may afford the claimant meaningful review of the [Commissioner's] ultimate findings." *Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2002). Therefore, the record must contain evidence to support the ALJ's findings, *and* the ALJ must rationally articulate a basis for those findings. *Steele*, 290 F.3d at 941.

In this case, the ALJ applied the five-step analysis outlined above, finding at step one that plaintiff was not engaged in substantial gainful activity and had not been since the alleged onset of his disability. (R. 18). At step two, the ALJ noted that plaintiff had been treated for depression, substance dependence, and various physical complaints, and found that his mental impairments were severe because "they impose at least minimal restrictions on [plaintiff's] ability to perform work related activities." (R. 19). At

step three, the ALJ considered both plaintiff's metal and physical impairments. As to plaintiff's mental impairments, the ALJ found that the record did not establish that plaintiff met listings 12.04 or 12.09, and additionally, that "in the event [plaintiff] were able to achieve and maintain sobriety, his mental functioning would improve significantly, to the extent that he would be only slightly limited in his ability to perform and sustain the mental demands of work." (R. 20). As for plaintiff's physical impairments, the ALJ found that they did not meet or equal listing 1.05. (R. 21).

At step four, the ALJ found that plaintiff could not perform his past relevant work. (R. 30). Specifically, the ALJ found that "during the period [plaintiff] admittedly has continued to use street drugs frequently, he has lacked, and will continue to lack, the mental RFC to sustain simple unskilled work, because his reliability and ability to keep to a daily and weekly schedule are markedly impaired by his drug use." (R. 30). However, the ALJ further stated that "if [plaintiff] were able to achieve and maintain sobriety, and to improve his treatment compliance for his mild underlying depression, [plaintiff] would be only slightly limited in his ability to perform the mental demands of work." *Id.* As for the plaintiff's physical RFC, the ALJ found that he could perform and sustain a wide range of light work. (R. 32).

Finally, the ALJ determined that at the fifth step, considering the plaintiff's age, educational background, work experience and RFC, if he were able to achieve and sustain sobriety, he would be capable of making a successful adjustment to work that exists in significant numbers in the national economy and that his substance dependence is a contributing factor material to any disability. (R. 34). Therefore, the ALJ concluded that plaintiff was not disabled under the Act. *Id.*

16

As stated above, the ALJ must build an accurate and logical bridge from the evidence to his conclusion. *Green v. Apfel*, 204 F.3d 780, 781 (7th Cir. 2000). The ALJ must "sufficiently articulate his assessment of the evidence to 'assure us that the ALJ considered the important evidence . . . [and to enable] us to trace the path of the ALJ's reasoning.'" *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (per curium) (quoting *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985). "An ALJ may not simply select and discuss only that evidence which favors his ultimate conclusion. Rather, an ALJ's decision must be based upon consideration of all relevant evidence." *Smith v. Apfel*, 231 F.3d 433, 438 (7th Cir. 2000) (internal citations omitted). Further, "[m]ore weight is generally given to the opinion of a treating physician because of his greater familiarity with the claimant's conditions and circumstances." *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000).

In Burnett's case, the ALJ found that "the objective evidence does not establish that claimant's combined substance dependence and resulting moderate major depression are currently so severe as to medically meet or equal listings 12.09 or 12.04." (R. 20). In support, the ALJ cites Dr. Johnson's testimony that "claimant's mental impairments currently impose only slight limitations on claimant's daily and social activities." The ALJ's also cites Dr. Johnson's opinion that "claimant has not had documented episodes of decompensation," and "his mental function would improve if claimant were able to achieve and maintain full sobriety for an extended period." The ALJ further relies on Dr. Tomassetti's consultative exam results which state that plaintiff's mental impairment "is not so severe as to meet or equal listing 12.09 and/or 12.04, since it imposes only slight limitations on [his] daily and social activities, and

17

often (but not frequently) interferes with claimant's concentration."

As support for his conclusion, the ALJ stated that he primarily relied on Dr. Piszczor's contemporaneous progress notes. However, the ALJ completely ignored Dr. Piszczor's Psychological Psychiatric Impairment Report, dated March 13, 2000. In that report, Dr. Piszczor found that plaintiff suffered from the following affective disorders; anhedonia, weight loss, sleep loss, psychomotor retardation, decreased energy, feelings of guilt, feelings of worthlessness, acting without regard to likely painful consequences, infrequent suicidal thoughts, and difficulty concentrating or thinking. Dr. Piszczor found that these symptoms were triggered or caused by "encounter[s] with people", being "at home with family" and "other," namely that "occasional cocaine usage worsens [the depression]." Dr. Piszczor further found that plaintiff's illness caused repeated episodes of deterioration or decompensation and that he needs a highly structured and supportive living situation. He also opined that plaintiff was not able to work in a non-sheltered work setting because of his problems with concentration, his tendency to isolate, and his problems dealing with people. (R. 253).

In making his decision, the ALJ never addressed this March, 2000 report from Dr. Piszczor and his findings therein. The ALJ completely ignored the findings of plaintiff's treating physician for over a year. Instead, the ALJ relied on the contrary findings of Dr. Tomassetti, a DDS doctor, and the testimony of a confused medical expert, Dr. Johnson. At the hearing, Dr. Johnson testified that Dr. Piszczor indicated that plaintiff's restrictions on daily living activities and maintaining social functioning were slight. He also testified that Dr. Piszczor stated that plaintiff never had episodes of deterioration or decompensation in work or worklike settings. Dr. Johnson was

18

referencing the findings of Dr. Tomassetti, which directly contradicted the findings of Dr. Piszczor. Failure to address the findings of plaintiff's treating physician and adopting contrary findings of non-treating physicians without explanation constitutes error and requires that we remand the case to the ALJ for further review. *See Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001).

The ALJ also did not address the confusing testimony of Dr. Johnson, the medical expert. The ALJ accepted Dr. Johnson's testimony without referencing or explaining away its internal inconsistencies. Dr. Johnson opined that plaintiff had not had documented episodes of decompensation and did not require a sheltered work environment. Dr. Johnson further testified that he did not disagree with Dr. Piszczor's findings. However, Dr. Piszczor's records included findings that plaintiff did in fact have episodes of decompensation and did require a sheltered work environment. Dr. Johnson cannot make conclusions contrary to Dr. Piszczor's findings and still completely agree with them. The ALJ never addressed this issue.

Having found all of this, it is important to note that ultimately, the ALJ may well be correct regarding plaintiff's mental impairments. His substance abuse may very well turn out to have been a material contributing factor to his depression and any disability may stem in a material way from his substance abuse. However, on the record before us, we cannot sustain such a conclusion. The ALJ must address the opinion of Dr. Piszczor, plaintiff's treating physician, and must provide a more well reasoned basis for adopting the findings of Dr. Johnson. The ALJ has not provided us with an accurate and logical bridge from the evidence to her conclusions.

Plaintiff also contends that the ALJ erred because she did not give appropriate

19

weight to the findings of Dr. Matthews, his treating physician, regarding the severity of his neck problems. Dr. Matthews opined that plaintiff was "unable to perform even sedentary work due to his cervical disease, and that 'a major cause of [his] substance abuse is due to chronic debilitating [neck] pain'." Dr. Matthews found that plaintiff's cervical MRI showed severe cervical arthritis and moderate central stenosis, which may require surgery.

The ALJ found that she could not give Dr. Matthews' opinion controlling weight. In support of that finding, the ALJ cited the fact that plaintiff only had three documented visits with Dr. Matthews as of the date he completed the RFC form. The ALJ also stated that Dr. Matthews' notes did not document that plaintiff made frequent or consistent complaints to him about severe and persistent back or neck pain, or about significant problems affecting his ability to stand or walk. He also noted that Dr. Matthews' RFC opinion was inconsistent with plaintiff's statements to his other doctors, and with their more detailed and extensive objective exams and findings. In support, the ALJ cited to a number of findings from other physicians, all of which predated plaintiff's February, 2001 cervical MRI. The ALJ also found that Dr. Matthews' opinion that plaintiff's substance abuse was caused by his long history of debilitating neck pain was not consistent or supported by the other evidence in the record. Finally, the ALJ mentioned the fact that Dr. Matthews was an internist, "apparently early in his medical career, and apparently [did] not have orthopedic, neurological or psychiatric specialty training."

Dr. Matthews' findings were in large part based on plaintiff's February, 2001 cervical MRI. Dr. Matthews found that plaintiff's MRI showed degenerative disc

disease, worse at C4 to C5 and C5 to C6, and moderate central stenosis. He also found central disc herniation and a bone spur at C4 to C5, some narrowing of the foramen (passage for the nerve) at C4 to C5, and a disc bulge at C5 to C6 and C6 to C7. Based on those determinations, Dr. Matthews found that because of plaintiff's cervical disease, he was not eligible for even sedentary work. (R. 631). From the record, it appears that plaintiff's first cervical MRI was performed in February, 2001 and that Dr. Matthews was the first and only physician to review that MRI and make medical findings based on its results. Plaintiff's prior treating physicians and the DDS doctors never ordered or reviewed a cervical MRI.

While internal inconsistencies within plaintiff's medical record may provide good cause to deny controlling weight to a treating physician's opinion, the ALJ must adequately articulate his reasoning for discounting the opinion. *Clifford v. Apfel*, 227 F.3d 863, 871 (7th Cir. 2000) (holding that the ALJ erred in discounting a treating physician's findings because he did not adequately articulate how that opinion was inconsistent with other evidence in the record). In this case, the ALJ did not adequately articulate his reasoning for discounting Dr. Matthews' opinion. The ALJ cited to plaintiff's prior complaints of back pain and his extensive April, 2000 exam following an abnormal lumbar x-ray. The ALJ also noted Dr. Duvel's December, 2000 finding that plaintiff's neurological exam was essentially normal. However, none of this evidence is necessarily inconsistent with Dr. Matthews' evaluation of plaintiff's February, 2001 cervical MRI. Prior to Dr. Matthews, plaintiff's doctors appear to have focused on his back, not his neck. The ALJ did not adequately articulate his reasoning for discounting Dr. Matthews' opinion concerning plaintiff's cervical disease. Therefore, we remand this

21

case to the ALJ to further explore plaintiff's possible work limitations based on the results of his February, 2001 cervical MRI.

**Conclusion**

For the reasons set forth above, the Court finds that the ALJ's findings at Step three are not supported by substantial evidence, and that the ALJ failed to build an accurate and logical bridge between the record evidence and his conclusions that Burnett was not disabled, that his additions were a material contributing factor in his mental impairments, and that if sober he would be capable of performing other jobs in the national economy. The Court, therefore, grants Burnett's motion for summary judgment, and denies the Commissioner's. This Court remands this case to the Commissioner for further proceedings consistent with this opinion. It is so ordered.

ENTER:

MICHAEL T. MASON
United States Magistrate Judge

Dated: May 5, 2004

22